IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge David L. West

Civil Action No. 04-CV-01099-JLK-DLW

WOLF CREEK SKI CORPORATION, INC.,

Plaintiff,

vs.

LEAVELL-McCOMBS JOINT VENTURE, d/b/a
THE VILLAGE AT WOLF CREEK,

Defendant.

---

RECOMMENDATION OF MAGISTRATE JUDGE ON
PLAINTIFF WOLF CREEK SKI CORPORATION, INC.'S
MOTION FOR SUMMARY JUDGMENT

---

**ENTERED BY MAGISTRATE JUDGE DAVID L. WEST**

Plaintiff, Wolf Creek Ski Corporation, Inc. ("Wolf Creek") filed a Complaint for Declaratory

Judgment seeking a resolution of the dispute between Wolf Creek and Defendant, Leavell-McCombs

Joint Venture, d/b/a Village at Wolf Creek ("Joint Venture") to determine the rights and duties of

Wolf Creek and the Joint Venture under various provisions of the Ski, Utilities, Road and Parking

Easements for the Village at Wolf Creek, ("SUA") (Exhibit 12) executed July 13, 1999.  The Joint

Venture with its Answer filed a Counterclaim alleging Wolf Creek breached the SUA, breached its

implied duty to perform its obligations under the SUA in good faith, and breached its fiduciary duty.

Wolf Creek filed a Motion for Summary Judgment asking for a partial summary judgment dismissing

(1) the Joint Venture's claim that Wolf Creek breached its contractual obligation in the SUA in 1999,

(2) the Joint Venture's tort claim for breach of fiduciary duty because any fiduciary duty arises out

of and is subsumed within the SUA, and (3) to the extent either the fiduciary duty or contract claim

(including the good faith and fair dealing) survive, they are barred by the three year statute of

limitations.  Wolf Creek's Motion for Summary Judgment is the subject of this Recommendation.

## SUMMARY JUDGMENT BURDEN OF PROOF

To obtain summary judgment, Wolf Creek must prove that "there is no genuine issue as to

any material fact."  **_Simms v. Oklahoma ex rel. Dep't of Mental Health and Substance Abuse_**

**_Servs.,_** 165 F.3d 1321, 1326 (10th Cir. 1999).  "An issue is 'genuine' if there is sufficient evidence on

each side so that a rational trier of fact could resolve the issue either way."  **_Adler v. Wal-Mart_**

**_Stores, Inc.,_** 144 F.3d 664, 670 (10th Cir. 1998).  "An issue of fact is 'material' if under the

substantive law it is essential to the proper disposition of the claim."  _Id_.  In applying this standard,

this Court must "view the factual record and draw all reasonable inferences therefrom most favorably

to the Joint Venture.  _Id_.  A genuine issue of material fact exists if a rational juror could decide the

disputed allegations in the non-movant's favor based on the evidence presented and the disputed fact

might affect the outcome of the suit under the governing law.  _See_ **_Schwarz v. Bhd. of Maint. of Way_**

**_Employees_**_,_ 264 F.3d 1181, 1183 (10th Cir. 2001).

> Summary judgment is proper when the record, viewed in the light
> most favorable to the non-movant, indicates there is no genuine
> dispute over a material fact and the moving party is entitled to
> judgment as a matter of law.  _See_ **_Deepwater Investments, Ltd. v._**
> **_Jackson Hole Ski Corp._**, 938 F.2d 1105, 1110 (10th Cir. 1991);
> **_Russillo v. Scarborough_**, 935 F.2d 1167, 1170 (10th Cir. 1991).  The
> defendants, as the moving parties, have the burden of demonstrating
> beyond a reasonable doubt that they are entitled to summary
> judgment.  **_Hicks v. City of Watonga, Okla._**, 942 F.2d 737, 743 (10th

Cir. 1991).  If they meet this burden then Seip must set fort specific facts showing a genuine issue for trial on a material matter.  *See* ***Bacchus Indus., Inc. v. Arvin Indus., Inc.***, 939 F.2d 887, 891 (10th Cir. 1991); ***Applied Genetics Int'l., Inc. v. First Affiliated Secs., Inc.***, 912 F.2d 1238, 1241 (10th Cir. 1990).  ***Seip v. D. G. Coleman, Inc.***, 796 F. Supp. 1398 (1992).

## BACKGROUND

In 1976 the Pitcher family bought the Wolf Creek Ski Area located in the Rio Grande National Forest, in Southwest Colorado, and it has been operated predominantly by Kingsbury Pitcher, father and Davey Pitcher, son.  The Joint Venture consisted of Pete Leavell ("Leavell") and Red McCombs ("McCombs") with Bob Honts ("Honts") as the real estate listing agent and project manager.  The purpose of the Joint Venture was to develop a resort (Village) adjacent to the Wolf Creek Ski Area.  In 1984 the Joint Venture sought Wolf Creek support for a land exchange of approximately 300 acres in the Rio Grande National Forest adjacent to the ski area.  In 1986 the Joint Venture acquired title to approximately 300 acres from the United States Forest Service ("USFS") which is within the area governed by Wolf Creek Special Use Permit.  In 1987 Kingsbury Pitcher had an option to purchase a 10% interest in the 300 acres pursuant to an Option and Tenancy in Common Agreement (Exhibit A-10) dated January 22, 1985, which was subsequently sold back to the Joint Venture.

A time line of events is as follows:

**December 1993**: The Joint Venture obtained Mineral County approval of the sale of 12.5 acres of Village property to Wolf Creek for the construction of ski lifts. (Exhibit A-16)

**July 8, 1997:** Wolf Creek began the process of seeking USFS approval for new chairlift and parking lots.  (Exhibit A-17)

3

**October 1997**: A draft Environmental Assessment was prepared by Wolf Creek for submission to the USFS which referred to a future ski lift and parking lot for Wolf Creek and an access road intended to be a future link to the Village. (Exhibit A-18)

**1997-1998**: Wolf Creek sought USFS authorization for ski area facilities expansion in order that Wolf Creek could construct (a) two parking lots known as the "Tranquility" lots, (b) road access to the parking lots, also intended to be the future link to the Village and (c) the new Alberta Lift which was to be within the exterior boundaries of the Village.

**February 20, 1998**: Kingsbury Pitcher wrote Pete Leavell that the road from Highway 160 to the Village property was surveyed and mapped. Hopefully USFS approval and start of construction early summer. We will carry engineering and construction at Wolf Creek's expense. (Exhibit A-19).

**July 25, 1998**: The USFS Environmental Assessment showed the road to serve as access to private land (Village), but Wolf Creek was not basing its need for action on speculative interest, but on needs determined by existing growth patterns. (Exhibit A-23)

**August 21, 1998**: The Carson Forest Watch wrote the USFS and alerted the USFS that the access road would serve the Village, and thereby created standing to appeal the October 27, 1998 USFS Decision Notice. (Exhibit A-34)

**October 27, 1998**: The USFS issued a Decision Notice approving (a) parking lots and (b) access road to parking lots that would likely serve as the future link to the Village. (Exhibit A-28)

**October 29, 1998**: An Environmental Assessment was issued by the USFS concerning the parking lots and road. (Exhibit A-29)

**November 6, 1998**: Wolf Creek and the Joint Venture have met to work out details of the contracts. (Exhibit A-30)

**December 18, 1998**: Amended Scenic Easement.

**January 5, 1999**: USFS withdrew Decision Notice of October 27, 1998 for further analysis of Carson Watch appeal. (Exhibit A-36)

**February 3, 1999**: Kingsbury Pitcher executed contract for purchase of ski lift for Alberta. (Exhibit A-40)

**March 12, 1999**: Carson Forest Watch letter to USFS which reviewed the Environmental Assessment and commented that the EA failed to show that road would be access for the Village. (Exhibit A-37)

**March 24, 1999**: Draft Access Road Agreement had changes not included in the final draft, that without USFS approval of access road, the corresponding easement grants for ski trails and lift easements need to be subject to review and/or renegotiation.  (Exhibit A-32)

**March 29, 1999**: Kingsbury Pitcher wrote "Dear Venture Partners...we want to move forward with our construction of our next lift which will benefit all of us and to make arrangements for the easiest and most cost effective access to the Village.  The EA also covers the entry road. ...what L-M (Joint Venture) gains from this easement is a dedicated entry to the Village.  (Exhibit A-33)

**March 29, 1999**: Colorado Wild letter to USFS describing the cumulative impact the Village would have on the environment.  (Exhibit A-38)

**June 14, 1999**: USFS Revised Decision Notice approving Alberta Lift, parking lots and access road.  (Exhibit 4)

**July 16, 1999**: Wolf Creek and Joint Venture execute four contracts, including Ski Utilities, Road and Parking Easements for the Village at Wolf Creek ("SUA") (Exhibit 12) which is the document most pertinent to this discussion.

Article I § 1.01(5) reads as follows:

1.01(5)  In order to implement the Preliminary Development Plan, L-M contemplates that additional agreements and detailed plans, specifications and drawings will be required in the future.  The parties agree to use good faith efforts to establish such additional agreements and to develop the appropriate plans, specifications and drawings to implement the Preliminary Development Plan, as may be desired and paid for solely by L-M.

Article II §2.01 reads as follows:

2.01 <u>Village Road Easements</u>.  Wolf Creek has granted, bargained, sold and conveyed unto L-M the Village Road Easement, which is a permanent, non-exclusive easement over and across portions of the Wolf Creek Land for the purpose of constructing and maintaining an access road and walkways to the Village Land, parking areas, utility services, groundwater collection facilities.  The road shall serve as the primary access route for vehicular traffic on the Village Land.  The dimensions and design of the road shall include, at L-M's sole expense, engineering for future expansion of the road right-of-way for public transportation services, including a rail transit line all of which must be covered as set forth in the Village Road Easement.  The

5

approximate location of the access road is shown on the location map (the "Location Map") attached hereto as Exhibit "D". The Village Road Easement area is legally described on Exhibit "E" attached hereto.

Article II § 2.03 reads as follows:

2.03 <u>Common Access Road, Visitors Center and Parking In Ski Area</u>. Concurrently with the pursuit of final approvals for the Preliminary Development Plan with Mineral County, the parties agree to pursue USFS special use approvals to allow for the construction, operation and maintenance of an access road extending from U.S. Highway 160, to and through the main entrance to the Ski Area and then extending onto the Village Land. It is contemplated that to the extent allowable under the USFS Permit, these special use approvals shall be held jointly by both Wolf Creek and L-M and that these approvals shall include permission to construct, operate and maintain within the USFS Permit area buildings and two (2) parking lots to provide a minimum of 400 parking spaces. In addition, L-M intends to construct a visitor's center on its land adjacent to the USFS Permit Area, and Wolf Creek and L-M agree to use best efforts to cause the USFS to permit a portion of the road to run to the boundary of the USFS Permit Land adjacent to the visitor's center site. The approximate locations of the access road and parking lots are shown on the Location Map.

Article IV § 5.01 reads as follows:

ARTICLE V

CREATION OF USFS ACCESS ROAD, PARKING LOTS AND VISITORS CENTER ARRANGEMENTS

5.01 <u>USFS Approvals</u>. Wolf Creek has obtained from the USFS permission to construct a twenty-three foot (23') wide access road extending from U.S. Highway No. 160 and through the base area of the Ski Area. The design and alignment of this access road is set forth and described in the map and related documents described as "Alternative IV Project Data" prepared by Erik Potten dated July 21, 1998. No modifications or changes to this design or alignment shall be made without L-M's prior written consent and approval. Simultaneously with the pursuit of approvals for the Preliminary Development Plan and, if required under the USFS Permit or

6

applicable law, the parties shall jointly apply for and diligently pursue any and all necessary USFS approvals for the creation, operation and maintenance of the access road and parking lots described in this Article V.

Article V § 5.02 reads as follows:

5.02 <u>Construction Design, Management and Cost Contributions</u>. Wolf Creek, at Wolf Creek's sole cost and expense, shall cause to be designed and constructed an all-weather, gravel-based access road designed to accommodate asphalt or concrete paving of no less than 23 feet in width, extending from the exit off U. S. Highway No. 160, through the base area of the Ski Area, and then to the westerly boundary of the Village Land. L-M, at its sole cost and expense, may elect to pave the access road and otherwise upgrade or improve the access road at any time after Wolf Creek constructs the access road, subject to the prior review and approval of Wolf Creek, which approval shall not be unreasonably withheld.

**August 3, 1999**: Colorado Wild appealed June 14, 1999 Revised Decision Notice.  (Exhibit 13)

**August 20, 1999**: Phone call between Davey Pitcher, Jeff Berman of Colorado Wild and USFS where a compromise was reached that the access road would not go all the way to the Village, 250 ft. short.

**August 31, 1999**: Settlement Letter from Joyner of USFS to Colorado Wild.  (Exhibit 14)

**September 15, 1999**: Joint Venture received Settlement Letter (Exhibit 14) from Wolf Creek.

**September 15, 1999**: Kingsbury Pitcher to Bob Honts, we got you a partial road and we will get you the rest of it.  (Exhibit A-59)

**September 17, 1999**: The June 14, 1999 USFS Decision Notice becomes final.

**September 29, 1999**: Bob Honts' letter to Red McCombs stating "Road approval within 250 ft. of Village property line is a major step forward. We will also need to seek a road access permit which will likely require EA."  Joint Venture decided to delay USFS access approval until after Mineral County approved the Preliminary PUD.  (Exhibit 17)

**November 15, 1999**: Bob Honts' letter to Joint Venture that the venture entered an area of the most intensive and sensitive environmental review on the face of the earth.  (Exhibit 18)

7

**December 16, 1999**: Bob Honts' letter to attorney White that Honts may have found a way to get access road to Village without the lengthy, expensive and potentially dangerous (from a litigation point of view) environmental assessment or environmental impact statement process.  (Exhibit A-47)

**January 26, 2000**: Bob Honts begins communicating directly with USFS.  (Exhibit 21)

**March 16, 2000**: Bob Honts' letter to Davey Pitcher requesting a united front as to the USFS, we need your support with USFS.  (Exhibit A-48)

**March 28, 2000:** Bob Honts met with USFS along with Tom Glass and attorney White. (Exhibit 19)

**June 28, 2000**: Davey Pitcher letter to Mineral County supporting Village Plan (Exhibit A-49)

**August 24, 2000**:  Kingsbury Pitcher approved Village Plan and density of 2,172.  (Exhibit A-50)

**June 12, 2001**: Joint Venture filed application for access to Village property.  (Exhibit 2 pg. 263)

**June 19, 2001**: Davey Pitcher's and Kingsbury Pitcher's letter to USFS supporting Joint Venture's request to extend road 250 ft. to Village.  (Exhibit A-3)

**September 7, 2001**: Davey Pitcher provided Joint Venture with a map showing road that deviated from route USFS approved in June 1999.  (Exhibit 7, Exhibit A-53)

**October 8, 2001**:   Kingsbury Pitcher's letter to Joint Venture requesting Joint Venture not attempt to do parallel engineering...you can rely on Wolf Creek.  (Exhibit A-1)

**December 4, 2001**: Joint Venture drafts default letter to Wolf Creek.  (Temporarily under seal Docket Entry 66.)

**December 5, 2001**: Kingsbury Pitcher letter to Congressman McInnis opposing Joint Venture's efforts (Congressional Pilot Energy Efficiency Project) to get access road without environmental review.  (Exhibit A-54)

**January 2, 2002**: Davey Pitcher letter to Village partners that he was hard pressed to support the Village as it was a political hot potato.  (Exhibit A-55)

**April 2, 2002**: Bob Honts sends draft default letter to Tom Glass.  (Exhibit 35)

**April 7, 2002**: Chris Paul (Leavell attorney) letter to Rubin (Wolf Creek attorney) with warning.  (Exhibit L-M 00252)

**January 10, 2003**: Red McCombs' letter to Davey Pitcher putting him on notice of Wolf Creek obligations.  (Exhibit L-M 00250)

**2003**: Pete Leavell sold interest in Joint Venture to Red McCombs.  (Plaintiff's Statement Undisputed Facts #5.)

**October 2003**: Joint Venture sought USFS authorization for access road, which it amended December 15, 2003.

**April 12, 2004**: Termination Agreement, Mutual Release.  (Exhibit 33)

**April 22, 2004**: Wolf Creek letter to USFS retracting June 19, 2001 letter supporting road as best alignment for access to the Village.  (Exhibit A-5)

**April 29, 2004**: Joint Venture's Notice of Default Letter.  (Exhibit A-56)

**May 5, 2004**: Wolf Creek files Complaint.

**June 7, 2004**: Joint Venture files Answer and Counterclaim.

**September 10, 2004**: Wolf Creek amended complaint to include two claims for breach of contract.

## STATUTE OF LIMITATIONS

Wolf Creek claims in its Motion for Summary Judgment that the Joint Venture Counterclaim of breach of contract, breach of good faith and fair dealing and breach of fiduciary duty are barred by the three year statute of limitations, pursuant to C.R.S. 13-80-101.

Wolf Creek argues that the Joint Venture received the Joyner letter (Exhibit 14) on September 15, 1999 and that the Joint Venture knew that Wolf Creek had not consulted with the Joint Venture during the USFS Colorado Wild negotiations August 20, 1999.  Additionally, Wolf Creek contends that the Joint Venture knew on September 15, 1999 that a new USFS access permit

and environmental assessment were required to connect the access road the final 250 ft. to the Village property.  (Exhibit 17)

The Joint Venture argues that its counterclaims are not time-barred because the limitations period was tolled by Kingsbury Pitcher's and Davey Pitcher's continued reassurances that they would obtain USFS access approval, until December 5, 2001 when the Joint Venture became aware of the breach.  (Exhibits A-19, A-33, A-1 and A-3) The Joint Venture contends that these assurances that Wolf Creek would get a permitted access road to the Village resulted in their being lulled to sleep on its rights per *Colorado-Ute Elec. Ass'n. v. Envirotech Corp.*, 524 F. Supp. 1152 (D. Colo. 1981). The purpose of the equitable estoppel doctrine is to prevent a party from benefitting through inducement of another to forego a claim, *Lee v. City & County of Denver*, 482 P.2d 389, 392 (Colo. App. 1971).  The elements of equitable estoppel are: (1) Wolf Creek must have known the facts, (2) Wolf Creek must have intended that its conduct be acted on, or, must have acted in a manner such that the Joint Venture had a right to believe that Wolf Creek was so intended, (3) the Joint Venture must have been ignorant of the true facts, and (4) the Joint Venture must have reasonably relied upon Wolf Creek's conduct to the injury of the Joint Venture.

This Court finds there are genuine material questions of fact as to whether the SUA contract (Exhibit 12) was ever breached; and if it was breached, when did the Joint Venture realize it had been breached which would be the instant the cause of action would accrue, and whether or not the Joint Venture reasonably relied on Wolf Creek's assurances to the Joint Venture's detriment.  The SUA (Exhibit 12 § 2.03) calls for Wolf Creek and the Joint Venture to "pursue USFS special use approvals to allow for the construction of a...access road extending from U. S. Highway 160...extending onto the Village Land."  Section 5.01 "...the parties shall jointly apply for and diligently pursue any and

10

all necessary approvals for the creation...of the access road...."  Was the compromise (Exhibit 14) reached by Davey Pitcher and Colorado Wild that left access 250 ft. short of the Village property a breach?  Was it recognized by the Joint Venture as a breach?  Pete Leavell, a former joint venturer did not think so.  (Exhibit 25 at pg. 5)  Bob Honts, project manager for the Joint Venture at least initially thought the compromise was okay, when he stated it was a "major step forward" (Exhibit 17), in the context "of the most intensive and sensitive environmental review on the face of the earth." (Exhibit 18 pg. 94)  Wolf Creek argues that the Joint Venture's reliance on the Pitchers' assurances was not reasonable because in Bob Honts' deposition he stated,

> "...from the time we didn't get the road in the 1999 fall period, it was clear to me that in spite of the commitments from Kingsbury Pitcher and the others, that the Village had to take an active role.  We could no longer sit back and not be involved as we had in 1999, and we kind of got shafted in that process.  R. Honts Depo. II at 552-53, Exhibit 34).

Subsequently, the Joint Venture viewed the Pitcher - Colorado Wild compromise as a "secret deal" and a breach of the SUA.  Wolf Creek supported the Village Plan and access with Mineral County and USFS (Exhibit A-49), June 28, 2000.  The first documented indication of the Joint Venture being aware of a possible breach, in that Wolf Creek might not have used its best efforts to obtain access to the Village, occurred on December 4, 2001  when the Joint Venture had its attorneys draft a default letter alleging breach of the SUA.  That was followed by Kingsbury Pitcher's letter of December 5, 2001 (Exhibit A-54) to Congressman McInnis opposing the Joint Venture's effort with the Pilot Energy Efficiency Project to get access without environmental review and Davey Pitcher's letter (Exhibit A-55) to the Village partners that he was hard pressed to support the Village as it had become a political hot potato.  Whether or not the Joint Venture's reliance on Wolf Creek's

assurances was reasonable is a genuine question of material fact with sufficient evidence on each side so a rational trier of fact could resolve the issue either way. *Adler*. Taking the December 4, 2001 Draft Default Letter as the only documented date that the Joint Venture recognized an alleged breach and a cause of action may have occurred, that results in the Joint Venture's Counterclaim having been filed June 7, 2004 to be within the applicable Statute of Limitations. This Court recommends that Wolf Creek's Motion for Summary Judgment should be denied as to the Joint Venture's Counterclaim being brought outside the three year Statute of Limitations.

## BREACH OF FIDUCIARY DUTY

The Joint Venture's Counterclaim also asserts that Wolf Creek had a fiduciary duty to secure a USFS access permit to the Village at the time Wolf Creek sought to expand the ski area with additional parking lots and the Alberta Ski Lift. This duty was based upon Wolf Creek's actions beginning in 1998 when Kingsbury Pitcher indicated to the Joint Venture that Wolf Creek would represent and/or get access to the Village (Exhibit A-19, Exhibit A-33) and assurances (Exhibit A-59) after the July 16, 1999 SUA (Exhibit 12). The Joint Venture argues that Wolf Creek's fiduciary duty was not subsumed by the SUA (Exhibit 12) because Wolf Creek denied enforceability of the SUA and the fiduciary duty extends beyond the SUA because of assurances by Wolf Creek subsequent to the execution of the SUA.

Wolf Creek contends that the Joint Venture's counterclaim of breach of fiduciary duty should be dismissed because of the economic loss rule, in that the fiduciary duty was subsumed by the SUA and that Wolf Creek does not challenge the existence of a valid SUA, but the parties dispute the identity of certain exhibits to the SUA. *(See* Motion at pg.10 ¶ 28; Reply, Section V(A), ¶ 28, Reply at pg. 28.) The Court agrees that Wolf Creek is not contesting the existence of a valid agreement

12

between the parties, leaving the issue of whether the fiduciary duty is subsumed by the SUA and should be dismissed pursuant to the economic loss doctrine.

Is there a fiduciary duty independent of the duties memorialized in the 1999 SUA?

The Joint Venture states in its Counterclaim that the fiduciary duties were "created by the Agreements and its promises to act on behalf of the Joint Venture, to act for the benefit of the Joint Venture in matters connected with the Agreements." (Exhibit 6 at pg. 18) Additionally, Bob Honts and Red McCombs both testified that all understandings related to Wolf Creek's representation of the Joint Venture concerning the access road were memorialized in the 1999 SUA. (Exhibit 2 at pgs. 94, 102 -105, Exhibit 11 at pgs. 59-60)

Pete Leavell stated in his sworn affidavit, "[t]he four agreements were the entirety of the agreements between the Joint Venture and the Wolf Creek Ski Corporation." (Leavell Aff. at ¶ 3, Exhibit 25)

Mr. Honts testified:

> **A:**   Actually Mr. McCombs and Mr. Charles Leavell were not really in favor of granting the easements, stating that the Pitchers had not performed after they had sold them 12.5 acres for ski lifts in 1993 and '94. They were very reluctant.
> The following day, I went and met with Kingsbury Pitcher, told him that we - there was not a firm agreement but that I was recommending it strongly in his behalf. Bear in mind, he was also my employer and their landowner partners.
> It was in that meeting where he made it clear to me that the burden for getting this road approved, built surveyed and construction - constructed were the ski corporation. And he wanted no interference with me in getting those approvals.
> In fact, later that year he strongly recommended that we delay the process that I had laid out in a timetable for 1998 to finalize Mineral County's approval of a revised PUD resolution. They already has a resolution in place. He asked that we delay that. He asked that we delay an application for wastewater saying that the ski corporation

would probably prefer to do a joint treatment plant.  He asked that we delay the amendment to the water court order that at that time we thought might be necessary because all of those things required public hearings and public exposure.  His argument was, any of that would weaken our attempt to get approval of the ski area expansion which included The Village access road.

**Q:**     Did you believe that to be true?

**A:**     I did.  I went to the venturers, I told him that was his request. They agreed that Kingsbury Pitcher and the ski corporation were the experts on our team to get Forest Service approvals *** him and them exact Pat.

And in fact we did do those things and there's adequate evidence of that.

**Q:**     And did this agreement that you've talked about, you know, this arrangement, you know, involving the easements being, you know, offered in exchange or provided in exchange for this - for the ski corporation's action, was all that memorialized in the '99 agreement in the ski utilities agreement.

**A:**     No, There were four agreements.

**Q:**     Okay.

**A:**     It was all memorialized in an initial document that led to three drafts of a memorandum of understanding.

Honts Depo., Ex. 2, at pg. 102, 1.15 to pg. 105, 1.22.  Like Mr. Honts, Mr. McCombs testified that

Mr. Kingsbury's promise to act for the benefit of the Joint Venture in obtaining the access road

permit was made part of the Agreements:

**Q:**     Okay.  So at this point in time they hadn't - they hadn't obtained a permit and a - and a permit was going to be necessary in the future.  Is that right?

**A:**     Yeah.  That's a what it appears.  And in my mind they would be - they would get it.

**Q:**     That the ski area would - would on their own -

**A:**     Yes.

**Q:**     – get the permit?

**A:**     Uh-huh.

**Q:**     And what do you base that on?

**A:**     That was my understanding of the agreement for the granting of the easement was that they would get the permit for the road and build the road.

**Q:**     Did you have an understanding that they would carry out all

14

the administrative work with the U.S. Forest Service to get that permit?

**A:**     I don't know what I assumed there.  I don't know what all that

meant.

**Q:**     Did you have an understanding as to who would foot the bill for - for all the administrative and environmental studies and all that were associated with getting the permit?

**A:**     Well, my understanding was that they would get the permit.

**Q:**     On - on behalf of the village?

**A:**     Yes, sure.

(McCombs Depo., Ex. 11, at pg. 59, 1.6 to pg. 60, 1.11.)

Defendant argues that there is an independent duty of care because Wolf Creek agreed to carry the permit process with USFS before July 16, 1999 SUA and thereafter.  Wolf Creek reiterated its desire to carry the permit process because of Wolf Creek's long term working relationship with the USFS and requested that the Joint Venture allow Wolf Creek to be the lead in the permitting process.  This does not create an independent duty of care outside of the contract, but rather one of many strategies consistent with the 1999 SUA.  Another strategy that would be consistent with paragraphs 2.03 and 5.01 of the 1999 SUA is the unilateral lobbying effort by the Joint Venture to get Congressional legislation (Pilot Energy Efficiency Project) approving access to the Village without environmental review.   Under Colorado law, a party who has suffered only economic loss from the breach of a contractual duty is barred from asserting a tort claim absent an independent duty of care under tort law. *Tuchman v.  Pell Rudman Trust Co.*, 245 F. Supp. 2d 1156 (D. Colo. 2003) (holding that the plaintiff would not be allowed to proceed on both his contract and tort claims, negligence and breach of fiduciary duty, absent a showing that the tort duties were independent of those arising out of contract); *Town of Alma v. Azco Constr., Inc.* 10 P. 3d 1256, 1264 (Colo. 2000).  The Joint Venture could defeat the economic loss doctrine if it demonstrated that "the duties alleged tortiously breached

15

by Wolf Creek were different from, and not contemplated by, those in contract. ***Tuchman v. Pell Rudman Trust Co., N.A.***, 245 F. Supp. 2d 1156.  The Court having reviewed the record and drawing all reasonable inferences therefrom most favorably to the Joint Venture, finds and recommends that there is no genuine issue of material fact that establishes that Wolf Creek had an independent duty of care to the Joint Venture to obtain access to the Village above and beyond paragraphs 2.01, 2.02 and 2.05 of the 1999 SUA, and therefore, the Joint Venture's claim of breach of fiduciary duty against Wolf Creek should be barred.

## BREACH OF CONTRACT AND BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

The Joint Venture's Counterclaim alleges breach of contract and breach of implied duty of good faith and fair dealing in that Wolf Creek was to secure a USFS permit when it sought to expand the ski area, but instead, Wolf Creek's secret compromise with Colorado Wild traded away the road approval for the right to build the Alberta Lift.  The Joint Venture contends that the purpose of the 1999 SUA was for Wolf Creek to provide a road from Highway 160 to the Village and Wolf Creek violated section 5.01 of the 1999 SUA by allowing a modification to the access road without consent of the Joint Venture.  Simply, the issue is whether Wolf Creek diligently pursued the necessary USFS approval.

Wolf Creek contends that there was no breach of the 1999 SUA because Wolf Creek did diligently pursue USFS approval but such approval was not within Wolf Creek's control, especially in light of environmental groups questioning the connectivity between the Village and the Ski Area expansion.  In fact, the USFS had issued a Decision Notice October 27, 1998 (Exhibit A-28) approving the parking lots and the access road that would likely serve as the future link to the Village.

16

Wolf Creek also contends that the 1999 SUA had no requirement that Wolf Creek obtain the access permit in 1999, nor that the access permit was tied to the ski area expansion.  Wolf Creek alleges that the Joint Venture decided to delay USFS access approval until after Mineral County approved the Preliminary PUD.  (Exhibit 17)  The 1999 SUA provides for future joint applications, therefore, the parties expected additional applications.

In reviewing the undisputed and disputed facts presented by the parties in the motions related to summary judgment as well as the numerous exhibits attached thereto, (Exhibits A-54, A-55, L-M00252, L-M00250, A-5 and A-56) this Court finds that there are many genuine issues of material fact as to whether or not the 1999 SUA (Exhibit 12) agreement was breached by Wolf Creek's allegedly not diligently pursuing the necessary USFS approval in 1999 or thereafter.  The Court recommends that Wolf Creek's Motion for Summary Judgment as it relates to Defendant's claim of breach of contract and breach of implied duty of good faith and fair dealing be denied.

## CONCLUSION

For the reasons stated above, the Court **RECOMMENDS**:

1.      Plaintiff's Motion for Summary Judgment against Defendant be **GRANTED** as to Defendant's Claim of Breach of Fiduciary Duty, and

2.      Plaintiff's Motion for Summary Judgment against Defendant be **DENIED** as to Defendant's claim of breach of contract and implied duty of good faith and fair dealing, and

3.      Plaintiff's Motion for Summary Judgment against Defendant claiming that Defendant's Counterclaims are barred by the statute of limitations be **DENIED**.

**NOTICE:  Pursuant to 28 U.S.C. § 636(b)(1)© and Fed. R. Civ. P. 72(b), the**

parties have ten (10) days after service of this recommendation to serve and file written, specific objections to the above recommendation with the District Judge assigned to the case.  The District Judge need not consider frivolous, conclusive, or general objections.   A party's failure to file and serve such written, specific objections waives *de novo* review of the recommendation by the District Judge, Fed. R. Civ. P. 72(b), <u>Thomas v. Arn</u>, 474 U.S. 140, 148-53 (1985), and also waives appellate review of both factual and legal questions.   <u>Makin v. Colorado Dep't of Corrections</u>, 183 F.3d 1205, 1210 (10th Cir. 1999); <u>Talley v. Hesse</u>, 91 F.3d 1411, 1412-13 (10th Cir. 1996).

DATED: December 1, 2005.

BY THE COURT:

<u>s/David L. West</u>

**United States Magistrate Judge**